IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

　　　　　　　　Plaintiff,

v.

JIMMIE ANTHONY BEARD,

　　　　　　　　　　Defendant.

CRIMINAL ACTION NO.

1:20-CR-00351

## JIM BEARD'S SENTENCING MEMORANDUM

Jim Beard, through counsel, respectfully submits this Sentencing Memorandum to the Court in in advance of his sentencing, which is scheduled for August 27, 2024.

As the attached letters from Mr. Beard's family members and a former colleague demonstrate, while Mr. Beard has acknowledged his serious mistakes and culpability in this case, the conduct at issue represents an aberration in what has otherwise been a law-abiding life. Mr. Beard asks the Court to take this, along with

the other information contained in this Memorandum and presented at sentencing, into account when fashioning an appropriate sentence.

On April 8, 2024, Mr. Beard agreed to waive his right to a jury trial and plead guilty to counts 4 (18 U.S.C. § 666) and 8 (26 U.S.C. § 7212(a)) of the Indictment. The charges were the result of Mr. Beard's employment with the City of Atlanta, where he served as the Chief Financial Officer for approximately six-and-a-half years. Mr. Beard understands that he engaged in criminal conduct, that he has no one to blame but himself, and takes full responsibility for his conduct. He understands that he took advantage of the trust that the City of Atlanta and its residents put in him, and for that, he's truly sorry. That being said, Mr. Beard's criminal conduct does not fully define his tenure as City CFO. As outlined in more detail below, despite his misconduct, the City of Atlanta benefited substantially from Mr. Beard's work.

This Sentencing Memorandum addresses several issues. First, undersigned counsel addresses several outstanding objections to the pre-sentence report (PSR), including calculation of the loss amount, application of the Zero Point Offender provision under Section 4C1.1 of the United States Sentencing Guidelines (USSG), and the application of three enhancements under USSG 2T1.1. Second, this Memo discusses the sentencing factors contained in 18 U.S.C. § 3553(a), in support of the

Court imposing a fair and reasonable sentence, which is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

Importantly, nothing in this Sentencing Memorandum should be construed in any way as Mr. Beard offering an "excuse" for his misconduct or downplaying his criminal culpability.  To the contrary, Mr. Beard fully accepts responsibility for his actions, and continues to show sincere remorse for his mistakes.  Instead, we are hopeful that the Court finds the information contained in this Memo helpful in imposing an appropriate sentence.

## I.    Objections to PSR

**<u>Paragraphs 1-27:</u>**  To clarify any confusion, Mr. Beard does not object to the PSR's summary of the indictment.  Mr. Beard's counsel simply wanted the PSR to make clear that this was merely a summation of the indictment, which the final PSR does to Mr. Beard's satisfaction. Accordingly, Mr. Beard withdraws this objection.

**<u>Paragraphs 31-84</u>**:  The basis of Mr. Beard's objection to these paragraphs is simply to clarify that the summary contained therein appears to be lifted nearly verbatim from the government's case file.  While the Court is, of course, permitted to consider "relevant conduct" at sentencing, undersigned counsel for Mr. Beard respectfully points out that, while Mr. Beard has pleaded guilty to Counts 4 and 8 of the Indictment, and fully accepts responsibility for his conduct, many of the allegations

contained in these paragraphs have not been proven, even by a preponderance of the evidence.  Even worse, some of the allegations contained in these paragraphs appear to be directly contrary to the evidence.

To be clear, in agreeing to plead guilty, Mr. Beard agreed that some of the transactions he engaged in during his time as the city Chief Financial Officer were not proper.  Mr. Beard stands fully by that admission.  That does not mean, however, that every transaction or trip listed on the government's loss spreadsheet was improper.   In fact, the PSR even notes that, according to the investigation file, Mr. Beard "frequently traveled for COA business and was involved in various professional boards and organizations."  PSR ¶ 36. This statement is supported by multiple interview reports and other evidence that was produced to Mr. Beard by the government during the course of discovery.  The fact of the matter is that Mr. Beard could not do his job sitting at his desk at City Hall. Instead, he was frequently required to travel, both nationally and internationally, as part of the multi-billion-dollar transactions that he led as the city CFO.  Those projects are discussed in more detail below.

The PSR appears to start with the presumption that Mr. Beard's transactions and trips were improper unless Mr. Beard provided evidence to prove otherwise.  *See, e.g.,* PSR ¶ 85, Probation Officer's Response (noting that the final PSR did not

remove certain transactions from the government's loss chart because Mr. Beard "did not identify which items should be removed from the loss amount calculations"). Respectfully, however, this is not proper, as it improperly shifts the burden to Mr. Beard.  As the Court well knows, it is the government that has the burden to prove the loss amount, by a preponderance of the evidence.  This also ignores the reality that Mr. Beard does not have access to most documents and data that would help support his position, due to the City of Atlanta's destruction of said information after Mr. Beard was no longer employed with the city, a fact that has been fully briefed in Mr. Beard's pretrial submissions.

Mr. Beard respectfully submits that the government should be required to prove these facts, through admissible evidence, at the sentencing hearing, before the Court considers them in fashioning an appropriate sentence.  This is particularly true for the transactions that the government alleges should be included in the loss amount. To illustrate the unsupported assumptions contained in the PSR, undersigned counsel offers the following by way of example only:

- In Paragraphs 42 and 43, the PSR lists trips that Mr. Beard took to New Orleans, and notes that while on these trips, Mr. Beard engaged in personal activities with friends and family.  The PSR suggests that because of this, these trips were fraudulent and should be included in the loss amount.  However,

the fact that Mr. Beard may have brought family members on a business trip, or that he may have engaged in personal activities while on a business trip, does not prove that the primary purpose of the trip was not business.  Engaging in personal activities on a work trip is simply not unlawful. In fact, the PSR cites an FBI interview of a New Orleans attorney with whom Mr. Beard worked on City of Atlanta bond transactions, who confirmed that Mr. Beard met with him while in New Orleans and would discuss City of Atlanta business.   PSR ¶ 36.   Other evidence produced to Mr. Beard by the government in discovery (including an FBI interview of Mr. Beard's stepdaughter, Ms. Emily Brown) supports the fact that Mr. Beard would often bring family members on work trips (at his own personal expense), but that he would work during the day, and meet with them in the evening after he was done with work.   Again, this does not amount to fraud.    *Even if* the government can prove that Mr. Beard brought his family members with him on a work trip, and *even if* the government could prove that, in addition to a business meeting, he engaged in personal activities while on that trip, does *not* make the transaction criminally fraudulent.   Instead, the government must prove, by a preponderance of the evidence, that there was *no legitimate business purpose* for the trip. The government simply cannot meet this burden

for a very large percentage of the transactions that they include in the loss amount.

- Similarly, in Paragraph 44, the PSR states that Mr. Beard would schedule "last-minute meetings to coincide with travel taken by" his family and would use "these meetings as an excuse to charge his travel on his COA credit card." Again, for the reasons stated above, this is not criminal "fraud" and should not be included in the loss amount. *Even if* the government could prove that Mr. Beard set up a work meeting as a "pretext" because he wanted to be in a certain city for personal reasons, this again does not amount to criminal fraud. Instead, the government must be able to prove, by a preponderance of the evidence, that there was *no legitimate business purpose* for the trip. The government cannot meet this burden for a very large percentage of the transactions that they include in the loss amount.

- In paragraph 45, the PSR states that Mr. Beard defrauded the City of Atlanta when he attended an in-person meeting with a business associate in New York. According to the PSR, although there appears to be little question that this trip was for business purposes, it was nevertheless fraudulent because the person Mr. Beard was to meet with told the FBI that the meeting could have been conducted via telephone. Respectfully, the fact that a meeting is done in

person when it could have just as easily been done by telephone is simply not fraud and should not be included in the loss amount.[1]  Instead, the government must be able to prove, by a preponderance of the evidence, that there was *no legitimate business purpose* for the trip. The government cannot meet this burden for a very large percentage of the transactions that they include in the loss amount.

- Paragraphs 46-48:  These paragraphs suggest that several of Mr. Beard's trips and expenses were fraudulent because they occurred on the weekend.  This is not evidence of fraud, as Mr. Beard often worked on the weekend, including out of town.  In fact, as part of discovery, the DOJ produced to Mr. Beard at least one FBI interview report of a banker with whom Mr. Beard worked on bond transactions, who indeed confirmed that she met with Mr. Beard in New York on the weekend on at least one occasion to discuss City of Atlanta business.  The fact that an expense or trip occurred on a weekend is simply not evidence of fraud, and these transactions should not be included in the loss

---

[1] In fact, it is apparently so common for people to schedule in-person meetings that, in hindsight, could or should have been an email or telephone call, that the idea has become the punchline of countless internet memes, including a coffee mug that one can by on Etsy that says: "Yet another meeting that could have been an email." https://www.etsy.com/listing/692245167/yet-another-meeting-that-could-have-been.

amount. Instead, the government must be able to prove, by a preponderance of the evidence, that there was *no legitimate business purpose* for the trip. The government cannot meet this burden for a very large percentage of the transactions that they include in the loss amount.

**Paragraph 74:**  Mr. Beard respectfully objects to the PSR's alleged "additional tax liabilities."  This information appears to be based upon information obtained by the DOJ and includes various expenses and deductions that are unquestionably proper. Accordingly, the government should be required to prove these loss amounts, by a preponderance of the evidence, at sentencing.

**Paragraph 82:**   Mr. Beard respectfully objects to Paragraph 82 because it is factually incorrect.   Mr. Beard and Ms. Brown were legitimately married, in a ceremony at the Commerce Club in Atlanta, in the presence of friends and family, on August 6, 2011.  While it is true that Mr. Beard and Ms. Brown did not obtain a *marriage certificate* until 2020, they were indeed factually and legally married since August 2011.

**Paragraph 85:**  Mr. Beard respectfully objects to these alleged loss amounts.  As stated above, this Paragraph appears to be based upon information obtained by the DOJ and includes various expenses and deductions that should not be included.

Accordingly, the government should be required to prove these loss amounts, by a preponderance of the evidence, at sentencing.

**Paragraph 92:**  Mr. Beard respectfully objects to these alleged loss amounts.  As stated above, this information appears to be based upon information obtained by the DOJ and includes various expenses and deductions that should not be included. Accordingly, the government should be required to prove these loss amounts, by a preponderance of the evidence, at sentencing.

**Paragraph 97:**  Mr. Beard respectfully objects to these alleged loss amounts.  As stated above, this Paragraph appears to be based upon information obtained by the DOJ and includes various expenses and deductions that should not be included. Accordingly, the government should be required to prove these loss amounts, by a preponderance of the evidence, at sentencing.

**Paragraph 98:**  Mr. Beard objects to this Paragraph, as the enhancement listed in USSG § 2T1.1(b)(1) does not apply in this case.  This enhancement applies where the defendant "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity."  The only possible argument that can be advanced in support of applying this enhancement would be to argue that Mr. Beard "failed to report or correctly identify" any income is that he obstructed his tax audit by submitting altered documentation to the IRS. However, this is the exact same

conduct underlying his guilty plea to Count 8 and, therefore, using the same facts to justify this enhancement would amount to improper "double counting." The Eleventh Circuit has made clear that impermissible double counting occurs when "one part of the Guidelines is applied to increase punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Naves*, 252 F.3d 1166, 1168 (11th Cir. 2001). Put simply, application of this enhancement would punish Mr. Beard twice for the exact same conduct.

**Paragraph 99**: Mr. Beard objects to this Paragraph, as the enhancement listed in USSG § 2T1.1(b)(2) does not apply in this case. This enhancement applies where a defendant used "sophisticated means."

Specifically, the Guidelines state that the 2T1.1 sophisticated means enhancement only applies to "*especially complex* or *especially intricate* offense conduct pertaining to the execution of concealment of an offense." (emphasis added). USSG § 2T1.1, Application Note 5. The Guidelines go on to give examples of such sophistication, including "hiding assets or transactions, or both, through the use of fictious entities, corporate shells, or offshore financial accounts." *Id.*

Mr. Beard's conduct does not justify application of this enhancement. According to the PSR, this enhancement is proper because Mr. Beard "redacted billing

11

information on receipts including the last four digit of card numbers used to purchase airline tickets and the billing address."  PSR ¶ 99.

In *United States v. Barakat*, for example, the Eleventh Circuit held that the mere failure to report income to an accountant does not involve "sophisticated means" for purposes of Section 2T1.1. 130 F.3d 1448, 1457 (11th Cir. 1997) (citing *United States v. Stokes*, 998 F.2d 279 (5th Cir. 1993)).

Mr. Beard's conduct—which, according to the PSR, consisted of using a Sharpie marker to black out certain billing information— was neither "especially complex" nor "especially "intricate."  This conduct, which is almost by definition "unsophisticated," should be contrasted to conduct that the Eleventh Circuit has held does justify the sophisticated means enhancement.  For example, in *United States v. Hunte*, the Eleventh Circuit upheld the application of this enhancement where the defendant created "multiple fictitious corporations" to claim improper refunds, and even opened bank accounts in the name of these fictious entities.  559 F. App'x 825, 831 (11th Cir. 2014).

Mr. Beard's alleged conduct falls far short of the level of sophistication that has been found to justify application of this enhancement.  Accordingly, this enhancement should not be applied in this case.

**Paragraph 102:**  Mr. Beard objects to this Paragraph, as the enhancement listed in USSG § 3C1.1 should not be applied in this case, as it would result in improper "double counting."

The Eleventh Circuit has made clear that impermissible double counting occurs when "one part of the Guidelines is applied to increase punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Naves*, 252 F.3d 1166, 1168 (11th Cir. 2001). The PSR attempts to impose a 2-level enhancement because Mr. Beard "willfully obstructed or impeded" the administration of justice.

However, the Sentencing Guidelines make clear that a 3C1.1 enhancement applies only where the defendant's obstructive conduct "occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction."  USSG § 3C1.1, Application Note 1.  *See also United States v. Pettus*, 90 F.4th 282 (4th Cir. 2024) ("An obstruction enhancement, however, is not generally available if the act of 'concealment' of the offense occurs as part of the offense itself or contemporaneous with the arrest, as opposed to post-arrest conduct.").

In fact, Application Note 7 makes clear that where a defendant is convicted of obstruction (as here), the 3C1.1 enhancement applies only "if a significant *further*

obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)." USSG § 3C1.1, Application Note 7 (emphasis added).

Here, Mr. Beard is not alleged to have engaged in *further* obstruction after the DOJ's investigation began or after charges were brought. Instead, the conduct that the PSR claims justifies a two-level increase under 3C1.1 (taking steps to obstruct the IRS audit) is the exact same conduct that made his conduct a crime in the first place. Mr. Beard did not engage in post-arrest obstruction. Applying a 2-level increase for the exact same conduct that led to the charge of obstructing an IRS audit would amount to impermissible "double counting" and, therefore, this enhancement is not proper.

**Paragraphs 103-107**:  Based on the objections above (to the loss amount, as well as to the inclusion of the enhancements listed in Paragraphs 98, 99, and 102), Mr. Beard objects to the PSR's offense level calculation.  Mr. Beard respectfully contends that his Adjusted Offense Level for Group B (Count 8) should be, *at maximum*, **14**, based on a loss amount of between $40,000 and $100,000, with no applicable enhancements.

**Paragraph 110**:  Mr. Beard objects to the conclusion contained in this Paragraph. Specifically, Mr. Beard contends that he is entitled to a 2-level decrease under the Zero Point Offender provision of Section 4C1.1.  While the indictment did include one Count under 18 U.S.C. § 922(o) (possession a machine gun), it is important to note that Mr. Beard did not plead guilty to this count and, as a result, the government has agreed to dismiss this count of the indictment. Moreover, even if it is appropriate to consider this dismissed count as "relevant conduct" in determining the application of the Zero Point Offender provision, a review of the allegations show that Mr. Beard did not "possess" a firearm "*in connection with* the offense."

First, it cannot be disputed that it is *not* enough for a defendant to merely "possess" a firearm to trigger this exclusion from Zero Point Offender treatment. Instead, the defendant must have possessed the firearm "*in connection with* the offense." Mr. Beard did not.

Although Section 4C1.1 does not define the term "in connection with," the Sentencing Guidelines define what it means to possess a firearm "in connection with" an offense in another Section – Section 2K2.1.  Although this Section is not directly applicable to the case at bar, it is instructive as to the meaning of the phrase "in connection with."

Section 2K2.1(6)(B) applies if a defendant "used or possessed any firearm in connection with another felony offense."  Application Note 14 to Section 2K2.1 explains that this applies only where "the firearm or ammunition *facilitated, or had the potential of facilitating*, another felony offense or another offense, respectfully." (emphasis added); *see also United States v. Jeffries*, 587 F.3d 690, 694-95 (5th Cir. 2009) (holding that Section 2K2.1(6)(B) applies, for example, if the firearm "emboldened" the second offense or if it served to protect other contraband.).

In amending Section 2K2.1 to provide the definition of "in connection with," the Sentencing Commission noted that the definition was adopted from language contained in the Supreme Court's decision in *Smith v. United States*, 508 U.S. 223 (1993). *See United States Sentencing Guidelines* Amendment 691 (available online at https://www.ussc.gov/guidelines/amendment/691).  *See also United States v. Gibbs*, 753 F. App'x 771, 773-74 (11th Cir. 2018) (adopting the Sentencing Commission's commentary under Section 2K2.1 and finding that possession of a firearm is "in connection with" a drug offense when it *facilitated or had the potential to facilitate* his possession of drugs.)

The definition of "in connection with" contained in Section 2K2.1 should apply with equal force to 4C1.1. This is demonstrated by the Sentencing Commission's

commentary when introducing the Zero Point Offender Provision.  (available online at https://www.ussc.gov/guidelines/amendment/821).

In that commentary, the Sentencing Commission made clear that their concern in drafting the exceptions to this provision was to exclude individuals who were *violent*.  There is absolutely no allegation that Mr. Beard was violent, or that Mr. Beard used, or even threatened violence in any way.  There is absolutely no evidence, or even allegation, that Mr. Beard possessed a firearm in a way that "facilitated" or "emboldened" his alleged fraud.

Similarly, the ordinary, dictionary definition of the phrase "in connection with" also supports the application of the Zero Point Offender provision.  Specifically, Merriam-Webster Dictionary defines "in connection with" to mean "in relation to (something): for reasons that relate to (something)."  (Taken from merriam-webster.com definition of "in connection with").  In other words, even assuming that Mr. Beard possessed a firearm (which has not been proven and which is subject to a count that has been dismissed), he did not do so "in connection" with his fraud offense because he did not possess a firearm "for reasons that relate to" his alleged fraud or in any way that facilitated or emboldened the alleged fraud.

In the commentary to the Zero Point Offender amendment, the Sentencing Commission also cross-references the "Safety Valve" provision, which is found at

USSG 5C1.2.  That provision also contains the phrase "in connection with."  Courts, including the Eleventh Circuit, have recognized that an offender may receive an enhancement for having "possessed" a firearm under 2D1.1(b)(1) and still get the safety valve relief afforded by 5C1.2. See *United States v. Carillo-Ayala,* 713 F.3d 82 (11th Cir. 2013); *United States v. Zavalza-Rodriguez*, 379 F.3d 1182 (10th Cir. 2004).  That is because one can "possess" a firearm without that possession being "in connection with" the offense.  That is precisely what happened here.  Even if the Court were to find that Mr. Beard "possessed" a firearm as alleged by the government, he cannot be said to have possessed that firearm "in connection with" a violation of either Count 4 or 8.  *See Carillo-Ayala*, 713 F.3d 82 (finding that the applicability of 2D1.1(b) does not automatically disqualify the defendant from safety-valve relief, because possession (the fact required by 2D1.1(b)) does not necessarily mean "possession in connection with" (the fact required by § 5C1.2)).  For these reasons, Mr. Beard respectfully contends that the Zero Point Offender provision applies to this case, and that his Offense Level should be decreased by 2 points under 4C1.1.

*At worst* for Mr. Beard, the Zero Point Offender provision, which does not directly define what it means by "in connection with" is ambiguous.  As the Eleventh Circuit has made abundantly clear, "[t]he 'rule of lenity' requires that actual

ambiguities in criminal statutes, including sentencing provisions, must be resolve din favor of criminal defendants." *United States v. Lazo-Ortiz*, 136 F.3d 1282, 1286 (11th Cir. 1998); *accord United States v. Trout*, 68 F.3d 1276, 1280 (11th Cir. 1995).

Accordingly, even if the Court does not agree with Mr. Beard's argument and finds that the Zero Point Offender provision is ambiguous, the Court must resolve the ambiguity in favor of Mr. Beard and apply the provision.

**Paragraph 111**:  Mr. Beard objects to the PSR's Total Offense Level, for the reasons discussed above.  Mr. Beard contends that his maximum Total Offense Level, after appropriate reductions for acceptance of responsibility and Zero Point Offender status, should be a **Level 10**, based on the following calculation:

- Zone A (Count 4) Adjusted Offense Level (Subtotal): **14**

- Zone B (Count 8) Adjusted Offense Level (Subtotal): **14**

- Increase in Offense Level Pursuant to 3D1.4: **+1**

- Combined Adjusted Offense Level: **15**

- Acceptance of Responsibility: **-3**

- Zero Point Offender: **-2**

**Total Offense Level:  10**

## II.    Application of the Section 3553(a) Factors

The Sentencing Reform Act, 18 U.S.C. § 3553, requires courts to consider the following factors in imposing a sentence:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established by the Sentencing Guidelines;

(5)    any pertinent policy statement;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

The Court is required to impose a sentence that is consistent with Mr. Beard's personal history and characteristics, which demonstrate the type of person he was and continues to be outside of his regrettable conduct at issue here.  Mr. Beard is also a very low risk statistically for recidivism.  A sentence not involving incarceration (which could include probation and a combination of conditions

including a period of home detention and community service) would be sufficient to deter him from future criminal conduct and would send a sufficient message of general and specific deterrence.

A. **The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Beard Support a Sentence of Non-Incarceration.**

As reflected in the Plea Agreement, Mr. Beard has accepted full responsibility and pleaded guilty to Counts 4 and 8 of the Indictment.  Mr. Beard is 60 years old, with a bachelor's and master's degree.  He is a first-time offender, with no criminal history.  PSR ¶ 116.  Mr. Beard grew up with modest means and traveled frequently as a child due to his father's military service.  PSR ¶ 24.

Mr. Beard is married and has two children; a 21-year-old son named Joseph, and a 26-year-old stepdaughter named Emily.  PSR ¶ 130.  Within the last month, Mr. Beard welcomed his first grandchild.  Mr. Beard is a committed father and grandfather and puts his family before anything else.

Although Mr. Beard clearly made some significant mistakes during his time as City CFO, the Court should not overlook the otherwise crucial work that Mr. Beard did for the city during his tenure.  Had this case gone to trial, the evidence would have demonstrated that Mr. Beard was crucial to bringing some of the largest projects in the history of Atlanta to fruition, including improvements to the airport,

State Farm Arena, and the Gulch construction project. These were billion-dollar deals that required Mr. Beard to travel frequently and be away from his family. This is why Mr. Beard brought his family members with him on some of the trips, at his own expense, so that he could squeeze in some personal time when he was done working.

During his time as city CFO, Mr. Beard received numerous accolades and accommodations, including a Proclamation by the Atlanta City Council in December 2017, which "gratefully acknowledges the many contributions of" Mr. Beard. In that Proclamation, the Atlanta City Council notes the following:

- That Mr. Beard has "masterfully endured the enormous weight of his role, carefully analyzing and maintaining Atlanta's multibillion dollar budgets, he helped steer the city through one of the toughest economic recessions in our nation's history and provided Atlanta with an enviable level of fiscal stability."

- "Under CFO' Beard's purposely authority, Moody's Investors Services upgraded the City's general obligation debt to the highest rating the City had in 40 years (nine credit rating upgrades) and most notably, Jim Beard skillfully guided the city's cash reserves to an historic degree, taking the "rainy day" fund to more than $175 million in reserves."

- "Jim Beard's outstanding leadership has not gone unnoticed. The National Association of Security Professionals presented CFO Beard with the prestigious Pacesetter Award in 2016, which recognizes individuals or funds that have ensured or promoted the full involvement of women or minorities in the securities industry."

- "Jim Beard has led the city with a steady hand and eye towards the future. His compassion, foresight, and good nature have set him apart as a gentle giant in city government.  This is Mr. Beard's incomparable legacy.

*See* **Attachment B.**  In December 2017, Mayor Kasim Reed also presented Mr. Beard the Phoenix Award, the city's highest honor for a citizen, which included the following statement, in part:

> With over 20 years of experience in municipal finance and accounting, Jim has demonstrated outstanding leadership in his role as Chief Financial Officer.  During his tenure, the City of Atlanta built the largest cash reserves in the city's history of over $175 million and earned nine consecutive credit ratings increases to AA+, which is the highest rating the City has seen in 40 years . . . Through his commitment to public service and the mission of the Department of Finance, CFO Beard has left an indelible mark on his colleagues and the City of Atlanta.

*See* **Attachment C**.

In June 2016, Mr. Beard received the prestigious Pacesetter Award from the National Association of Securities Professionals. According to the City's press release announcing Mr. Beard's receipt of the award:

> The Pacesetter Award recognizes individuals or funds that have ensured or promoted the full involvement of women or minorities in the securities industry. Beard was recognized for his practice of emphasizing opportunities for women and minority-owned firms to work with the City. "I applaud the National Association of Securities Professionals for recognizing my CFO Jim Beard for his outstanding career and commitment to inclusion in the securities industry," said Mayor Kasim Reed. "Jim's role as the Chief Financial Officer of the state's capital city goes beyond making sure the books are balanced and bills are paid. Through his leadership and support, the City of Atlanta's financial health is stronger and more stable than it has been in the last 30 years.

*See* **Attachment D**.

The following month, in July 2016, Mr. Beard received a Certificate of Appreciation from the Federal Communications Commission (FCC) "in honor of outstanding performance and dedication as an IAC [Intergovernmental Advisory Committee] member." *See* **Attachment E**.

As is clear from these documents, although Mr. Beard certainly made some serious mistakes during his tenure as CFO, there can be absolutely no question that Mr. Beard left the City of Atlanta in a substantially better financial position than where he found it.

That being said, Mr. Beard also understands that his misconduct casts a dark shadow over his otherwise great work for the City of Atlanta, and has caused damage to the city, his family, and his friends. He has reflected on those facts every day for

many years and is committed to doing everything he can to make the city whole and to make amends for his mistakes. He is truly sorry.

B. **A Sentence of Non-Incarceration Is Supported by the Guidelines and Is Appropriate.**

The sentence imposed by the Court must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a).  Recognizing the Court's prior reliance on the Sentencing Guidelines when imposing a sentence, a sentence of non-incarceration would be appropriate in this case.

As discussed in more detail above, undersigned counsel contends that, after application of the Zero Point Offender provision contained in USSG § 4C1.1, Mr. Beard's Total Offense Level is a 10, which is in Zone B.  In these circumstances, the Guidelines state that "a sentence other than a sentence of imprisonment … is generally appropriate."  USSG § 4C1.1, Note 10.  Accordingly, imposing a sentence that does not involve incarceration would not only be appropriate in this case, but would be consistent with the Sentencing Guidelines.

Moreover, studies have indicated that general deterrence is realized through the certainty of punishment, rather than its length or severity in any one particular case.  *See, e.g.*, Richard S. Frase, *A More Perfect System: Twenty-Five Years of*

25

*Guidelines Sentencing Reform (Punishment Purposes)*, 58 STAN. L. REV. 67, 72, 80 (2005).   A sentence not involving incarceration, but instead involving some combination of probation with conditions, would provide adequate deterrence— showing a certainty of punishment—while taking into account the characteristics and circumstances of this case.

In addition to having learned his lesson, Mr. Beard is a 60-year time offender who is unlikely, from a statistical standpoint, to be a recidivist.  *See, e.g.*, *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (recognizing that "recidivism ordinarily decreases with age"); *United States v. Irey*, 612 F.3d 1160, 1244 (11th Cir. 2010) (en banc) (Tjoflat, J., concurring) (recognizing the U.S. Sentencing Commission's report finding that "employment status" is negatively correlated with recidivism); see also U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (Dec. 7, 2017) ("Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed.").

## Conclusion

Mr. Beard acknowledges the wrongfulness of his actions and accepts full responsibility for them.  As discussed in more detail throughout this Memo, the Court should impose a sentence that does not involve incarceration, which is not

only appropriate based on the facts and circumstances of this case, but also supported by the Sentencing Guidelines.   Mr. Beard and undersigned counsel respectfully submit that an appropriate sentence in this case would involve some period of probation, combined with other non-incarceration conditions as deemed appropriate by the Court, including some period of home detention.

Undersigned counsel will be available during sentencing to address these issues further and answer any remaining questions the Court may have.

Respectfully submitted,

*/s/ Scott R. Grubman*
Scott R. Grubman
Georgia Bar No. 317011

Serreen Meki
Georgia Bar No. 139400

CHILIVIS GRUBMAN
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (main)
(404) 262-6505 (direct)
(404) 261-2842 (fax)
sgrubman@cglawfirm.com

Attorneys for Mr. Beard

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

The undersigned attorney hereby certifies that the foregoing document, which was prepared in accordance with L.R. 7.1,using Times New Roman, 14-point font, was filed using the Court's CM/ECF portal, which will automatically send service copies to all counsel of record.

So certified, today, August 23, 2024.

*/s/ Scott R. Grubman*
Scott R. Grubman
Ga. Bar No. 317011
