IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

JIMMIE ANTHONY "JIM" BEARD

Criminal Action No.

1:20-CR-0351-SCJ

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by Ryan K. Buchanan, United States Attorney, Garrett L. Bradford, Assistant United States Attorney for the Northern District of Georgia, and Trevor C. Wilmot, Trial Attorney for the Department of Justice, files this Sentencing Memorandum.

## Introduction

Jim Beard is a highly trained, accredited, and accomplished financial executive. He received dual undergraduate degrees in business administration from Florida International University for Finance and International Business, along with a certificate in International Bank Management & Banking, graduating magna cum laude as a member of a business honor society.  (Presentence Investigation Report ("PSR") ¶ 140; *see* Exhibit A (copy of Beard's Resume from April 2016)).  He went on to receive a Master's degree in Business Administration from Northwestern University, and FINRA series 7, 24, 27, 63, and 65 licenses.  (PSR ¶ 141; Ex. A at 3).  After his MBA, Beard held positions that sharpened his financial and compliance acumen.  For example, before joining the City of Atlanta ("COA"), Beard was the Director of Revenue and Compliance for Palm Beach County, Florida, where he "[e]nsure[d] compliance with all accounting policies" and

implemented "cost reduction initiatives." (Ex. A at 2). As his resume states, Beard was a "[s]enior executive with 20+ years of experience and a passion for finance, treasury, and investment management." (*Id.* at 1). From 2011 to 2018, he reached the apex of Atlanta government. (PSR ¶ 32). As Chief Financial Officer ("CFO"), Beard oversaw more than a hundred employees and was responsible for managing the City's finances while earning a taxpayer-funded salary of $260,000 to $270,000 per year (not counting additional income he earned through sitting on boards and participating in other professionally organizations). (Ex. A at 1; PSR ¶¶ 32, 146). He was one of the most powerful men in the City. This case is about the crimes Beard chose to commit with that knowledge, experience, and power to serve his own interests.

When the Reed administration ended in 2018, news media were investigating misuse of City funds, including through COA credit cards issued to senior executives. (*See* PSR ¶ 54). In Beard's case, the investigation revealed a more than $10,000 charge at a five-star Paris hotel, which was reported in the Atlanta Journal-Constitution and elsewhere.[1] (*Id.*).

A federal grand jury investigated Beard and discovered more: widespread theft of City funds; the purchase and possession of two restricted machine guns; false tax returns; and obstructing an IRS audit in relation to a fake personal business. (*See* Doc. 1). In September 2020, the grand jury returned an eight-count indictment, charging Beard with wire fraud, federal program theft, possession of

---

[1] *See, e.g.,* Dan Klepal, *Former Atlanta CFO repays $10K Paris hotel bill after AJC stories*, ATLANTA J. CONST., June 27, 2018, available at https://www.ajc.com/news/local-govt--politics/former-atlanta-cfo-repays-10k-paris-hotel-bill-after-ajc-stories/PseV0h29Dn4jUCPsfHjW9I/

machine guns, lying on a firearms form, and obstructing an IRS audit.  (Doc. 1).
In April 2024, pursuant to a negotiated plea agreement, Beard pleaded guilty to
federal program theft and tax obstruction.  (Doc. 130-1).

In the PSR, the probation officer determined that Beard's relevant conduct did
not group together, and so applied U.S.S.G. § 3D1.1 *et seq* to calculate the advisory
custody guidelines range (Group A for theft, and Group B for tax).  The PSR found
Beard's guidelines range, after a reduction for acceptance of responsibility, to be
33 to 41 months' imprisonment, based on a Total Offense Level of 20 and a
Criminal History Category of I.  (*See* PSR, Part D at page 41).

Objecting to the PSR, Beard:

- Contests all relevant conduct in the PSR;

- Refuses to admit even a single dollar of fraud and tax loss attributed to
  him in Group A and Group B; and

- Argues the PSR should have applied the two-level reduction for Zero
  Point Offender under U.S.S.G. § 4C1.1.

(*See id*. at ¶¶ 84, 92, 97, 110).  The probation officer also preserved objections for
Beard related to: (i) a tax enhancement for failing to report criminally derived
income over $10,000; (ii) a tax enhancement for sophisticated means; and (iii) an
obstruction of justice enhancement.  (*See id*. at ¶¶ 98, 99, 102).

As set forth below, the Court should overrule Beard's objections, find that
Beard's custody guidelines range is 33 to 41 months' imprisonment,[2] sentence

---

[2] Based on the nature of the PSR objections, Beard's refusal to provide financial
information for the PSR, and Beard's conduct in relation to the Government's
financial investigation into his ability to pay restitution and a fine, as further
discussed below, the Government believes that Beard is on the knife's edge of
losing the downward reduction for acceptance of responsibility.

Beard to a term of imprisonment within the final guidelines range, order restitution, and impose a fine.

**Relevant Conduct**

**1. Mr. Beard exploited his position to steal from the public.**

COA credit cards were reserved for high-level municipal executives. (PSR ¶ 33). Beard received his COA credit card in 2012 and signed a form certifying he would not use it for personal expenses. (PSR ¶ 33). Beard also understood that the credit card program required him to keep and provide receipts for every charge, and to give a work-related explanation for every charge. (PSR ¶¶ 33-34). The responsibility for fiscal oversight for Beard's COA credit card program fell to two lower-level COA employees in the Department of Finance, including Beard's executive assistant. (PSR ¶¶ 34-36). In other words, the credit card watchdogs worked for and reported to Beard. And Beard fully exploited his power over them – when his executive assistant attempted to follow the rules and requested receipts and justifications for charges, Beard would refuse and pushed her to process the expenses anyway. (*See* PSR ¶ 35, 76).[3]

At least as early as 2014, Beard began to use his COA credit card – which was paid using taxpayer dollars – so that he and those close to him could enjoy world class locations and accommodations, and experience fine cultural events. Beard's theft of public money was as egregious as it was long running. Over the years, despite a salary of more than $260,000 per year, Beard soaked the Atlanta taxpayer

---

[3] Beard cultivated this power dynamic and exploited staff beyond his own department – other City employees told agents that, under Beard, "if the COA CFO asks you for something, you do not ask questions." (PSR ¶ 61).

for approximately $74,000 in improper charges and stolen money.  (*See* PSR ¶¶ 85, 146).  His personal abuse of the COA credit card included:

In the summer of 2015 and again in 2016, Beard caused COA to pay for his stepdaughter and her boyfriend to stay at the high-end J.W. Marriott Hotel in Chicago while attending the Lollapalooza Music Festival.  (*See* PSR ¶¶ 14(g), 39-41, App'x A at 2; Doc. 1 at 6, 9, 10; Doc. 130-1 at 6-7).  The accommodations cost the taxpayers nearly $4,000.  (*Id.*).  Beard concealed the true purpose of the 2015 transaction from the City, claiming it was so he could attend a meeting – even though he was not in Chicago. (PSR ¶ 39).

In successive weekends in April 2016, Beard took his wife and then a personal travel companion to the New Orleans Jazz Fest, spending more than $2,600 of City money for airfare and a stay at the Windsor Court Hotel next to the French Quarter.  (PSR ¶¶ 42-43; Doc. 130-1 at 7).  Beard claimed the expenses were related to weekend work meetings with a New Orleans law firm that, in truth, did not happen.  (*Id.*).

For four days in October 2016, Beard and his wife went sightseeing around the San Francisco Bay Area, courtesy of the Atlanta taxpayer.  (PSR ¶ 44, App'x A at 3).  The expenses included airfare and a stay at the luxurious Fairmont Hotel, complete with room service, at a total cost more than $4,000.  (*Id.*).  Beard claimed that he attended a CFO conference that week but, instead, he and his wife enjoyed wine in Sonoma County, took in the Golden Gate Bridge, and generally enjoyed the Bay Area – but never stepped foot in any work conference.  (PSR ¶¶ 33-34).





In April 2017, Beard charged more than $10,000 to the COA credit card for a four-day stay at the Shangri-La Hotel in the heart of Paris, for a deluxe suite with a view of the Eiffel Tower.  (PSR ¶¶ 44, 49, 54, 75-77).  The trip was another

taxpayer-funded luxury vacation for Beard and his wife. (*Id.*). Afterward, Beard ignored his executive assistant's request for the hotel folio and the work reason for the trip. (PSR ¶ 76). A year went by. Only after the media began to report on the abuse of COA credit cards did Beard repay the COA. (PSR ¶ 54). But the repayment was not to clear up a mistake – it was an effort to prevent Beard from facing the consequences of his theft. When confronted by the FBI, Beard claimed that the trip was work-related (to personally inspect Paris's "street furniture") and the hotel charge was not meant for the COA credit card. (PSR ¶¶ 75-77). But based on witness interviews and a review of business records, Beard's work email[4] and work calendar, and photographs, the investigation found Beard's claims were a lie. (*Id.*).



---

[4] For example, Beard declined a work meeting request sent to his COA email while he was in Paris, stating that he could not attend the meeting because he was "on vacation." (PSR ¶ 77).





Beard also used the COA credit card to convert City funds into his personal bank account through a reimbursement scheme. (PSR ¶¶ 37, 50-54). Beard identified conferences where, if he spoke or played some other role, the conference

8

host would pay for his travel.  (*Id*.).  Beard charged those trips to the COA credit card and had the City pay for them as work-related conferences.  (*Id*.).  But then he would submit those same travel receipts (which the City had paid) to the conference hosts and request that he personally be reimbursed.  (*Id*.).  He never told the conference hosts that the City had already paid for the travel, and never told the City that the conference hosts had given him money for the travel.  (*Id*.).  Instead, Beard pocketed the money for himself.  (*Id*.).  All told, Beard enriched himself to the tune of nearly $17,000 in this scheme.[5]  (*See* PSR ¶85.)

### 2. Mr. Beard exploited his position to obtain two restricted machine guns.

In December 2015, after four years of being one of the most powerful members of COA government, with an inflated sense of entitlement and realizing that he could abuse his position without consequences, Beard used his City work email account, job title, and City funds to order two restricted[6] fully automatic machine guns from Daniel Defense for himself.[7]  (PSR ¶¶ 55-67).

---

[5] As described later with respect to his tax fraud, Beard would further exploit these trips to "triple-dip" — after wrongly pocketing money for travel that he never paid for, he would claim those same expenses as deductions on his taxes for his nonexistent business (even though he never paid for them in the first place), using them to fraudulently reduce the taxes he owed on his legitimate earnings.

[6] Federal law typically limits the sale and transfer of machine guns to the military and state and local law enforcement entities.  *See* 18 U.S.C. § 922(o)(2)(A).  As it follows, Beard could not purchase machine guns in his personal capacity.  It was only Beard's use of his title as CFO (and Daniel Defense's resulting belief that Beard was acting in conformity with his official duties) that he was able to obtain the machine guns.

[7] Beard was known to be a firearm enthusiast.

**From:** Beard, Jim [mailto:jbeard@AtlantaGa.Gov]
**Sent:** Monday, December 14, 2015 10:28 AM
**To:** ▮▮▮▮▮▮
**Subject:** Order

We are working on a PO now.

What is the proper Manufacturing Numbers/SKU for SOCOM-DDMK18 COMPLETE RIFLE and SOCOM-M4A1 COMPLETE RIFLE in black full auto?  Are 02-103-10221 and 02-103-10670 correct?

J. Anthony "Jim" Beard ¦ Chief Financial Officer ¦ City of Atlanta ¦ Department of Finance ¦ Suite 11100, 68 Mitchell Street SW, Atlanta GA 30303 ¦ Office: 404.330.6453 ¦ Fax: 404.420.6661 ¦ Email: jbeard@atlantaga.gov

https://www.hightail.com/u/jbeard
Please send all large attachments 10mb or higher to the link provided above.

Three days later, at Beard's direct instruction, a low-level employee in the Department of Finance emailed Daniel Defense a purchase order for the machine guns.  (PSR ¶ 55).  The employee instructed the company to send the machine guns to City Hall to the attention of Beard and an Atlanta Police Department ("APD") officer on the Executive Protection ("EP") detail assigned to protect the Mayor. (PSR ¶¶ 55, 58).  The EP officer, a former schoolteacher, later told agents he had no role in acquiring firearms for APD or EP, did not know Beard purchased two machine guns, and did not know his name was associated with the shipment of those guns.  (*See* PSR ¶ 66).

| From: | ████████████ @AtlantaGa.Gov> |
|---|---|
| Sent: | Thursday, December 17, 2015 3:20 PM |
| To: | ████████████ @danieldefense.com> |
| Cc: | Beard, Jim <jbeard@atlantaga.gov> |
| Subject: | Purchase Request |
| Attach: | 51611834_Daniel Defense, Inc..pdf |

Good afternoon Mr.████

Per Mr. Beard's request, please find attached the approved PO for the purchase request of the 2 equipment.

Please have the items to be sent to the address listed:

> **ATTN: R. Rivers/J. Beard**
> **APD – EP**
> **Mayor's Office**
> **68 Mitchell Street, SW, Suite 11100**
> **Atlanta, GA 30303-0312**

By early 2016, Beard repeatedly followed up with Daniel Defense on their progress in sending the guns. (PSR ¶ 56). On March 15 (Wednesday), 2016, Daniel Defense told Beard the machine guns would ship that day. (PSR ¶ 56). Beard responded by asking for expedited shipping to ensure "they arrive by Friday." Beard wanted the machine guns by Friday (March 17) because he scheduled to fly to Fort Lauderdale on Sunday (March 19). (*See id.*). Daniel Defense sent Beard the tracking numbers for the machine guns. (*Id.*).

| From: | ████████████ @danieldefense.com] |
|---|---|
| Sent: | 3/15/2016 5:50:02 PM |
| To: | ████████████ @danieldefense.com]; Beard, Jim [/O=ATLANTA/OU=CityHall/cn=Recipients/cn=jbeard] |
| Subject: | RE: Order |

Fed Ex Tracking #'s: 6601 6754 6401 & 6601 6754 6412

The machine guns arrived at City Hall on Thursday, March 16, and Beard received a notification email from the mail room. (*Id.*).

```
From:        MAILCENTER@ATLANTAGA.GOV [MAILCENTER@ATLANTAGA.GOV]
Sent:        3/16/2016 10:45:00 AM
To:          Beard, Jim [/O=ATLANTA/OU=CityHall/cn=Recipients/cn=jbeard]
Subject:     PACKAGE RECEIPT NOTIFICATION


Your Package Has Arrived!

Package Details:

      Tracking No.:  00660167546401
      Carrier.....:  Federal Express
      Service.....:

      Received From Carrier.....:  03/16/2016  1041
      Signed For By............:  PBREP

Received From:

      Company.....:  DANIEL DEFENSE
```

The day before Beard's flight, he went to a gun shop and bought two 30-round magazines designed to hold the same caliber ammunition used for the machineguns.  (PSR ¶ 57).

```
              STODDARDS  ATLANTA
              Thank you for shopping with us!
                   3/18/2016 6:26:09 PM
                    FIREARM ACCESSORY

2 Qty
RTS MAG AR556 SMOKE 30RD                              43.98
Subtotal                                             43.98
Tax                                                   3.52
Total                                                47.50
Debit                                                47.50
Change                                                0.00
              Loyal Customer: Jimmie Beard
```

A few weeks later, Daniel Defense asked for a Department of Treasury Tax Exemption Form relating to the guns.  (PSR ¶ 56).  Beard personally signed the form, falsely stating that the machine guns were purchased for the exclusive use of the APD.  (*Id.*).  Importantly, Beard never included a member of the APD (or EP) on a single communication with Daniel Defense, and APD (including its EP officers) were completely in the dark that Beard had purchased two restricted machine guns.  (PSR ¶¶ 55-67).

OMB No. 1513-0128 (05/31/2014)

**DEPARTMENT OF THE TREASURY**
ALCOHOL AND TOBACCO TAX AND TRADE BUREAU

**EXEMPTION CERTIFICATE (USE BY STATE OR LOCAL GOVERNMENTS)**
(For use by State and local governments (section 4221(a)(4) of the Internal Revenue Code).)

_December 17_ , 20_15_ I hereby certify that I am ___Chief Financial Officer___
(Month & Day)                                    (Title of Officer)

of ___City of Atlanta___ ; that I am authorized to execute this certificate; and that
(State or local government)

(check applicable type of certificate):

☐ The article or articles specified in the accompanying order, or on the reverse side hereof, (or)

☑ All orders placed by the purchaser for the period commencing ___12/17/2015___ and ending ___12/31/2016___ ,
(Date)                                          (Date)
(period not to exceed 12 calendar quarters)

are, or will be, purchased from ___Daniel Defense___ for the
(Name of manufacturer)

exclusive use of ___Atlanta Police Department___
(Governmental unit)

of ___City of Atlanta___
(State or local government)

I understand that the exemption from tax in the case of sales of articles under this exemption certificate to a State, etc., is limited to the sale of articles purchased for its exclusive use[1]. I understand that fraudulent use of this certificate for the purpose of securing this exemption will subject me and all parties making such fraudulent use of this certificate to all applicable criminal penalties under the Internal Revenue Code.

SIGNATURE                                    PRINTED NAME

J. Anthony Beard

ADDRESS

55 Trinity Street, Atlanta, Georgia 30303

In March 2017, about a year after he received the machine guns, Beard brought a locked case to EP's office.  (PSR ¶ 63-64).  According to two officers, Beard asked EP to temporarily hold the case while work was being done in his home.  (*Id.*).  Beard said the case contained guns, but he did not say they were machine guns.  (*Id.*).  EP accepted the case, but then for about a year thereafter was unable to get Beard to return for it, with Beard ignoring their phones calls and indicating he was too busy to deal with them.  (*Id.*).  At last, APD broke the locks and opened the case to inventory the contents as property.  (*Id.*).  Only then did APD learn there were COA-purchased machine guns inside.  (*Id.*).  Further, one of the guns had a sight mounted on it that had been purchased in May 2016 using Beard's COA credit card.  (*Id.*).



### 3. Beard falsified his tax returns to reduce his taxes and, during an IRS audit of one return, provided false and misleading statements and records.

In his 2013 federal tax return, Beard declared a personal business loss of over $33,500 for a sole proprietorship business, thereby reducing his taxable income and amount of taxes owed. (Doc. 130-1 at 8). In July 2015, the IRS audited the return, and requested documents to support the claimed business expenses. (*Id.*; PSR ¶ 71).

Beard responded by calling, writing, and submitting documents. (Doc. 130-1 at 8-9; PSR ¶ 71). Beard claimed to operate an "offshore infrastructure of finance business" and he further claimed to have had unreimbursed employee expenses from his position as Atlanta's CFO. (PSR ¶¶ 70-71). He submitted documents to support these claims, including airline and lodging receipts, and claims regarding business meals. (PSR ¶¶ 71-72; Doc. 130-1 at 8-9). Beard stated that the expenses were paid using credit cards in his name. (*Id.*). Based on these statements and

supporting documents, the IRS allowed Beard to deduct many of the expenses from his tax return.  (Doc. 130-1 at 9).

Subsequent investigation revealed, however, that Beard did not have a personal business.  (PSR ¶¶ 70, 73).  For example, Beard never disclosed a personal business in his COA personal financial disclosure forms.  (PSR ¶¶ 14(a), (e), (f), 22).  As another example, agents identified a Florida LLC called CGB Partners that named Beard as a member; yet, in response to a grand jury subpoena seeking all company records since the company's founding, Beard replied that no records existed.  (*See* Exhibit B (Beard's response to a grand jury subpoena on behalf of a business registered in his name, stating that no records existed for the business)).

Moreover, agents found that many of the purported expenses were paid by the City – through Beard's COA credit card – and were related to travel that Beard told the City was work-related.[8]  (PSR ¶ 73).  What's more, Beard redacted from the receipts information that would have allowed auditors to identify COA as the payor, such as the address for City Hall on receipts.  (PSR ¶ 72; *see* Exhibit C). Beard also fabricated other purported business expenses.  For example, he claimed to attend "Business Meetings" in New Orleans in September 2013, but Beard was there with a travel companion to attend an NFL football game.  (*See* PSR ¶ 73).

Beard's false tax returns were not limited to the 2013 return that was the subject of the IRS audit.  (PSR ¶ 68).  Rather, the investigation revealed that Beard wrote off personal business expenses in this fashion for several years, and brazenly continued to do it even after the audit began in July 2015.  (PSR ¶¶ 68, 71).  All

---

[8] These expenses could not have been unreimbursed expenses, of course, because the City paid Beard's COA credit card, not Beard himself.

told, the IRS determined that Beard underpaid his federal income taxes by more than $100,000.  (PSR ¶ 74).

### Acceptance of Responsibility

Beard is perilously close to losing the offense level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  (*See* PSR, ¶¶ 108-109).

"A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility . . . ."  *See* U.S.S.G. § 3E1.1, App. N. 1(A).

Beard's PSR objections fit the bill on this score.  Beard has objected to: (i) all relevant conduct (PSR, ¶ 84), (ii) every transaction that comprises the fraud loss amount (*id*.),[9] and (iii) the entire tax loss amount (*id*.).  Beard's counsel has informed the Government that he expects the Court to conduct a *de facto* bench trial to take evidence as to all of this.  As further discussed below, the Court should not take up Beard's sweeping objections – just the specifically articulated ones.  This litigating posture cannot be squared with either (i) basic principles underlying acceptance of responsibility or (ii) Beard's admissions at his guilty plea.  For example, by objecting to the entire tax loss, Beard suggests that he did not have a fake business.  Yet he admitted to obstructing an IRS audit by lying about a personal business, and he told the grand jury he has no records of a personal business. Beard also objected to every fraudulent expense specifically

---

[9] This list of charges was attached to the initial PSR distributed to the parties on July 23.  Objections to the initial PSR were due on August 7.  In other words, Beard had two weeks to specifically identify the charges that he disagreed with – and he has had the supporting evidence for these charges for years.

identified or even alluded to in the PSR, and refuses to admit to even a single improper reimbursement.

As one of the most baffling examples, Beard specifically agreed in his plea agreement that a trip to New Orleans in April 2016 "was personal and not related to City business," and that he "had no City business in New Orleans during that weekend, traveled with a personal companion, and he later represented to the IRS that this trip was for his personal consulting business and was not reimbursed by the City." (Doc. 1130-1 at 6-7). However, that reimbursement is now included in his sweeping objection to all loss items. And he even specifically attacks this reimbursement in his Sentencing Memo, boldly claiming that it has not been proven that "the primary purpose of the trip was not business," and "this does not amount to fraud." (Doc. 143 at 5-6). This is in no way consistent with accepting responsibility for his offenses.

Second, Beard's plea agreement requires him to cooperate fully in the investigation of the amount of forfeiture, restitution, and fine, as well as assets available to be applied to those obligations. (*See* Doc. 130-1 at ¶ 31). Since entering his plea, however, Beard has not been fully cooperative or truthful with the Government's attempt to investigate his finances, which has left the government unable to complete the financial investigation and trace assets as contemplated by the plea agreement. Nor has Beard been cooperative with the Probation Office's attempts to determine his financial standing or ability to pay a fine or restitution. (*See* PSR ¶¶ 147 (Beard only belatedly signed releases for his credit report and tax returns, resulting in his tax returns not being available yet), 148 ("the defendant has not provided information to determine his net worth and monthly cash flow"

17

and only produced statements for certain cherry-picked accounts), 149 ("the defendant has failed to provide requested information" regarding his ability to pay a fine)).

In short, Beard's conduct places him at risk of the Government asking the Court to revoke his credit for acceptance of responsibility in calculating Beard's guidelines range.

## Sentencing Guidelines Issues

As stated above, Beard objects to various offense level enhancements in the PSR. The Court should overrule the objections.

**1. Beard's sweeping objections to the relevant conduct and the loss amount are nonspecific and should be deemed waived.**

Beard's objections to all relevant conduct and the entire loss amounts (both as to the fraud and tax loss) amount to nonspecific objections that the Court should find are not specific enough to be taken up at sentencing. (*See* PSR, § 84.)

Challenges to the facts contained in a PSR must be made with "specificity and clarity" or else they are waived. *United States v. Bennett*, 472 F.3d 825, 832 (11th Cir. 2006) (citations omitted); *see United States v. Escoto*, 842 F. App'x 527, 531–32 (11th Cir. 2021) (holding that the sentencing court was entitled to rely on facts in the PSR that were not objected to "with specificity and clarity.").

Even so, after the final PSR was distributed to the parties – following the Government's efforts to engage with Beard as to the scope of contested loss – Beard identified 14 credit card transactions that he contended were legitimately incurred. After reviewing documents provided by Beard the evening of August 20, the Government agreed to remove seven charges totaling $18,091.54. But the

Government contends that the seven remaining charges Beard contests still go to loss. Accordingly, the Government will be prepared at sentencing to present evidence in support of approximately seven COA credit card charges that the defense has contested during separate communications amongst counsel and which are generically discussed in Beard's sentencing memo. (*See* Doc. 143 at 5-9). Assuming the Government carries its burden as to those charges, the Government calculates that the revised loss figures will be: (i) for Group A, $73,954.86, and (ii) for Group B $105,702.37 (tax loss is reduced by 28% of the $18,091.54 change in undeclared income).[10] This revision does not affect guidelines calculations but will affect restitution.

### 2. Beard does not qualify for Zero-Point Offender because machine guns were connected to the offense.

U.S.S.G. § 4C1.1 provides for a two-level reduction to the defendant's offense level if ten conditions are met. Relevant here, the seventh condition requires that "the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon . . . in connection with the offense." U.S.S.G. § 4C1.1(a)(7). As the party seeking a downward adjustment to the offense level, it is Beard's burden to prove by a preponderance of the evidence that he did not commit the proscribed conduct. *See United States v. Onofre-Segarra*, 126 F.3d 1308, 1310 (11th Cir. 1997); *United States v. Arroyo-Mata*, Crim. No. 09-cr-13-TCB, 2024 U.S. Dist. LEXIS 62601, at *5-6 (N.D. Ga. Apr. 1, 2024). Beard claims subsection (a)(7) does not apply because: (i) there is no proof he possessed machine guns; (ii) he is nonviolent and did not use the guns to

---

[10] *See* U.S.S.G. § 2T1.1(c)(1)(A).

commit violence; and (iii) he did not possess machine guns "in connection with the offense." (*See* Doc. 143 at 15-19; Beard's PSR Objections Letter dated August 7, 2024 ("Beard PSR Ltr.") at 7-11). The claims lack merit.

### a. Beard illegally possessed restricted machine guns, but also purchased, received, transferred, and disposed of them.

Beard states there is no proof that he possessed machineguns. (*See* Doc. 143 at 17-18 (claiming possession of machineguns "has not been proven . . ." and suggesting his possession has only been "alleged by the government"); Beard PSR Ltr. at 10-11 (same)). The claim bewilders because Beard admitted in the factual basis of his plea agreement that the evidence showed "by admissible evidence and beyond reasonable doubt" that he possessed the machine guns, specifically, that "Defendant directed the City . . . to pay for two custom-built machine guns he had ordered in December 2015 . . ." under false pretenses and then "*personally possessed the guns* . . . until in or about March 2017" before abandoning them with APD's Executive Protection detail. (*See* Doc. 130-1 at ¶ 13(g)(ii) (emphasis added)).[11]

---

[11] Beard continues to regard his conduct vis-à-vis the machine guns with casual and stunning disregard for its significance. (*See* Doc. 46 at 3-5 (Beard's motion to dismiss machine gun count, charging a violation of 18 U.S.C. § 922(o), claiming they are not "dangerous and unusual" and arguing the prohibition against machine gun possession "violates the Second Amendment"); Doc. 61 at 1-3 (Beard stating that "Section 922(o) *purports* to make it unlawful to possess a machine gun . . ." and claiming that machine guns are no more dangerous than any other firearm) (emphasis added). *But see* Doc. 53 (Government's opposition, pointing out: (i) the Supreme Court has stated it would be "startling" for the Second Amendment to protect machine guns; and (ii) multiple U.S. Circuit Courts of Appeal that have upheld the constitutionality of § 922(o), describing machine guns as "dangerous and unusual," "murderously effective," and "possess[ing] a firepower that outstrips any other kind of gun") (cleaned up, citations omitted)).

In addition, as shown above, Beard purchased, received, transferred, and disposed of the machineguns, which are other ways to run afoul of § 4C1.1(a)(7). *See also* PSR at ¶¶ 55-67 (discussing, *inter alia*, Beard's purchase of the machine guns, his deceptive claims as to the reason he purchased them, his receipt of the machineguns at City Hall without the knowledge of APD, his purchase of accessories for the guns and his transfer/disposal of the guns in a locked case at EP in March 2017).

Beard states that the Court should not consider any of this evidence because he did not plead guilty to the machine gun count.  (*See* Doc. 143 at 15, 17; Beard PSR Ltr. at 8, 10).  The assertion lacks merit because § 4C1.1 defines "offense" to include "all relevant conduct under § 1B1.1 . . . ." and not just the count of conviction. *See* §§ 4C1.1(b)(1); 1B1.1 App. N. 1(I).  Beard could never have obtained the machine guns were it not for his ability, as CFO, to commit City funds and procurement processes to purchase them; thus, the machine guns are intertwined with the relevant conduct here.  (*See*, *e.g.*, Doc. 1 at ¶12(b)).

### b. Whether Beard was violent or used the machine guns to commit violence is irrelevant for purposes of applying the Zero-Point Offender reduction.

Relying on Amendment 821 to the Sentencing Guidelines, which introduced § 4C1.1 in late 2023, Beard claims that the Sentencing Commission "made clear" that its concern was to exclude only violent individuals from receiving the reduction for Zero-Point Offender.  (*See* Doc. 143 at 16-17; Beard PSR Ltr. at 9-10). This claim finds no support in the plain text of Amendment 821 or § 4C1.1.

Amendment 821 enacted § 4C1.1 "for offenders who did not receive any criminal history points . . . and whose offense did not involve specified aggravating factors." *See* U.S.S.C. Amendment 821 (go to the section called "Reason for Amendment" at "Subpart 1 – Adjustment for Certain Zero-Point Offenders"). The Commission went on to explain that while the reduction applied to "some offenders with zero criminal history points," others were "appropriately excluded from eligibility . . . in light of . . . the existence of aggravating factors in the instant offense . . . ." *Id*. What Amendment 821 did not say was that the Commission's goal was to apply the reduction only to non-violent offenders.

This makes sense given the plain text of § 4C1.1, which requires that all ten conditions be met to trigger the offense level reduction. Those conditions disqualify a defendant from the reduction if either violent or non-violent conduct exists. Section 4C1.1(a)(3), for example, precludes the reduction for those who used "violence or credible threats of violence in connection with the offense[.]" By contrast, § 4C1.1(a)(6) precludes the reduction for defendants who caused "substantial financial hardship[.]" *See also United States v. Gowing*, Case No. 05 Crim. 782, 2024 U.S. Dist. LEXIS 133954, at *3-6 (S.D.N.Y. Jul. 30, 2024) (disqualifying the defendant from receiving the § 4C1.1. reduction because his conduct caused substantial financial hardship); *United States v. Stites*, Case No. 22-20020, 2024 U.S. Dist. LEXIS 130858, at *3-5 (D. Kan. Jul. 24, 2024) (same).

In other words, if the Sentencing Commission intended that the firearms prohibition applied solely to violent offenders, it surely would have said so. And the fact that certain nonviolent factors preclude the Zero-Point Offender reduction dooms Beard's argument.

### c. It does not matter whether Beard's possession of machine guns "facilitated" or "emboldened" the offense or relevant conduct.

Beard claims that the Court should look to U.S.S.G. § 2K2.1 to define "in connection with the offense" as used in § 4C1.1(a)(7). (*See* Beard PSR Ltr. at 8-11). Yet the Guidelines Manual cautions against doing so, stating that definitions of terms that appear in specific sections "are not designed for general applicability" and should only be applied to other sections "on a case by case basis." U.S.S.G. § 1B1.1 App. n. 2. Beard's proposed definition is both inapposite and unworkable for § 4C1.1(a)(7), so the Court should reject it.

Beard's proposed definition of "in connection with" is inapposite. Section 2, Part K of the Sentencing Guidelines relates to "Offenses Involving Public Safety," and § 2K2.1 is titled, "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition." In general, the base offense level under § 2K2.1 turns on the defendant's criminal history and the type of firearm unlawfully received, possessed, transported or transacted with. *See* U.S.S.G. § 2K2.1(a). That means – before specific offense characteristics are even considered – the section applies offense level points for the firearm's very presence in the offense conduct. *See id*. This is the case because it is already a crime for a person to possess some types of firearms – such as machine guns. *See* 18 U.S.C. § 922(o) (criminalizing possession of a machine gun); U.S.S.G. § 2K2.1(a)(5) (assigning an 18-point base offense level for possessing a machine gun); *see also* Doc. 130-1 at ¶ 13(g)(ii) (Beard's admission that he "personally possessed" machine guns).

Only then are specific offense characteristics considered in § 2K2.1. Among them is subsection (b)(6)(B), which provides for a four-level enhancement where the unlawfully possessed firearm was possessed "in connection with *another felony* offense . . ." (emphasis added). That is, an enhancement applies – beyond the penalty imposed for possessing the firearm in the first place – where the firearm facilitated the *second* felony offense. *Id*. at App. n. 14(A), and (C) (defining "another felony offense" as one "other than the . . . firearms possession or trafficking offense . . .").[12]

To sum up: the structure and purpose of § 2K2.1 assigns a base offense level for unlawfully possessing a machinegun in the first instance – as Beard did. Where that unlawful possession facilitated a second felony, more points are added. In this unique context, it is clear why the Commission would define "in connection with" in greater specificity than its ordinary meaning. Indeed, the Government has not identified another place in the Guidelines Manual where the Commission chose to define "in connection with."

The better approach is for the Court to give "in connection with" its ordinary meaning, untethered to the specific context of § 2K2.1(b)(6)(B). The plain meaning of "in connection with" is "on the subject of something."[13] And as explained above and in the PSR, the machine guns were intertwined with Beard's relevant conduct.

Applying Beard's definition would also lead to unworkable results. First, if, as Beard argues, "in connection with" required proof that the firearm "facilitated" or

---

[12] Indeed, Beard cites no case in which a court has relied on § 2K2.1(b)(6)(B) outside the context of a drug and gun nexus, which serves to demonstrate how unhelpful the definition is here. (*See* Beard PSR Ltr. at 8-10).

[13] *See* Cambridge University Press, available at: www.dictionary.cambridge.org/us/dictionary (last visited: Aug. 9, 2024).

"emboldened" another offense, courts would be stuck when examining § 4C1.1 when the possession of the firearm is *itself* the unlawful conduct. Other courts have had no trouble denying the Zero-Point Offender reduction in such a scenario, as should the Court here. *See, e.g., United States v. Harris*, Case No. 22-cr-335, 2024 U.S. Dist. LEXIS 84139, at *4 (N.D. Ohio May 9, 2024) (disqualifying the defendant under § 4C1.1(a)(7) where the offense conduct was limited to possessing a machine gun and thus could not "facilitate" another offense); *United States v. Castro*, Case No. CR-22-275, 2024 U.S. Dist. LEXIS 92501, at *3-4 (W.D. Okla. May 23, 2024) (disqualifying the defendant under § 4C1.1(a)(7) where he possessed the firearm *as a result of* the offense of making a false statement to purchase a firearm).

Second, to impose the words "facilitate" (defined as "to make something possible or easier") and "embolden" (defined as "to make someone brave") onto the definition of "in connection with" cannot be squared with the various acts, aside from possession, that trigger disqualification under subsection (a)(7).[14] Although Beard tries to focus the Court on "possession" alone, (*see* Doc. 143 at 15-19; Beard PSR Ltr. at 7-11), the condition precludes not just possession but, alternatively, the firearm's having been "possess[ed], receive[d], purchase[d], transport[ed], transfer[red], [sold], or otherwise dispose[d] of . . ." U.S.S.G. § 4C1.1(a)(7). Several of the proscribed acts would be virtually impossible to violate under Beard's definition. For example, if a defendant's conduct involved selling or disposing of a firearm, that conduct does not ordinarily make an offense "easier" or bear on the defendant's "bravery" to commit an offense.

In sum, Beard has not carried his burden. The objection should be denied.

---

[14] *See* CAMBRIDGE UNIVERSITY PRESS, available at: www.dictionary.cambridge.org/us/dictionary (last visited: Aug. 9, 2024).

**3. The Court should overrule Beard's objection to the enhancement for failing to report more than $10,000 in criminally derived income.**

As reflected in paragraph 98 of the PSR, Beard should receive a two-level increase pursuant to U.S.S.G. § 2T1.1(b)(1) because he "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." U.S.S.G. § 2T1.1(b)(1). Specifically, Beard "omitted income he received from third parties for COA expenses, and omitted income he received from the personal use of COA funds" on his IRS 1040 forms for tax years 2013-2017. (PSR ¶ 68). Those funds that he unlawfully converted to his own use and failed to report on his taxes exceeded $10,000 for each of the years 2015, 2016, and 2017. (PSR ¶ 68; *see* PSR App'x A). Indeed, the unreported criminal income totaled $12.928.52 for 2015, $26,382.90 for 2016, and $23,484.21 for 2017. (PSR App'x A). Therefore, any of those three years would independently serve as a basis for the § 2T1.1(b)(1) adjustment.

Beard argues in his sentencing memo that the only basis for applying this adjustment would be based on the altered documentation he submitted to the IRS and thus applying the adjustment would constitute double counting of the type forbidden by *United States v. Naves*, 252 F.3d 1166, 1168 (11th Cir. 2001). (Doc. 143 at 10-11). However, Beard's argument is misplaced. As stated above, the adjustment is triggered by Beard's initial failure to report his illegal income on his IRS 1040 forms, not the submission of the altered documents. And application of the adjustment would not be double counting because nowhere else in the calculations for Count 8 do the Guidelines account for the fact that the unreported

26

income was criminally derived (as opposed to derived from legitimate business). Accordingly, the adjustment should be applied.

**4.  The Court should overrule Beard's objection to the enhancement for use of sophisticated means.**

As reflected in paragraph 99 of the PSR, Beard should receive a two-level increase pursuant to U.S.S.G. § 2T1.1(b)(2) because "the offense involved sophisticated means." Application Note 5 to that Guideline explains, "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." U.S.S.G. § 2T1.1(b)(2) cmt. n.5.

The Eleventh Circuit has further explained that, in cases involving tax offenses, to trigger the adjustment the conduct must involve more than a "routine" tax evasion case. *United States v. Barakat*, 130 F.3d 1448, 1456 (11th Cir. 1997). A "routine" tax evasion case is one where a defendant merely fails to report income. *See id.* at 1457 ("merely failing to report income to an accountant" would not be sufficient to trigger the sophisticated means adjustment). But the hurdle to go from a "routine" case of failing to report income to one warranting the sophisticated means adjustment is a small one. *See United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) ("failure to accurately report their income would not alone support imposition of the sophisticated means enhancement. . . . [But t]he court need only find 'the presence of efforts at concealment that go beyond (not necessarily far beyond . . .) the concealment inherent in tax fraud.'" (citations

removed)); *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009) ("Although the mere failure to report income to an accountant does not involve sophisticated means [] a defendant need not use offshore bank accounts or transactions through fictitious entities in order for the enhancement to apply.") (citations removed). For example, courts have found sophisticated means in cases where:

- The defendant routed transactions through a campaign account. *United States v. Campbell*, 491 F.3d 1306, 1315–16 (11th Cir. 2007).

- The defendant set up two fictitious entities. *United States v. Maggert*, 428 F. App'x 874, 880 (11th Cir. 2011) ("To facilitate his tax evasion scheme, Maggert set up two fictitious entities and used them to try to hide his income. Such conduct falls squarely within § 2T1.1's definition of sophisticated means.").

- The defendant routed a $15,000 payment for consulting work through a trust account instead of his personal account. *United States v. Barakat*, 130 F.3d 1448, 1456 (11th Cir. 1997).

- The defendant used corporate forms to disguise personal income. *United States v. King*, 306 F. App'x 501, 521 (11th Cir. 2009) ("King did not merely fail to report income, but commingled and manipulated his corporate and personal finances in order to conceal the existence, or at least large amounts, of his personal income."); *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011) (noting that the sophisticated means adjustment "does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case," and that the

use of corporate forms "to impede the discovery of personal income, as they were used here, permits the imposition of the enhancement.").

- The defendant's scheme spanned three years and required intricate planning. *United States v. Clarke*, 562 F.3d 1158, 1166 (11th Cir. 2009).

Beard's tax evasion scheme was far more sophisticated and layered than the routine tax evasion case of merely failing to report income. Over the course of five tax years (2013-2017),[15] Beard did not just fail to report the income he illegally stole from COA taxpayers, he affirmatively submitted false Schedule C forms that included false deductions to improperly offset taxes he would have owed on his legal, reported income. (PSR ¶¶ 68-70). He shielded these false deductions by using a fictitious entity – his purported consulting business – to give the deductions an aura of legitimacy. *(Id.).* He called and wrote the IRS and submitted statements to perpetuate his concealment and confuse the auditor. (PSR ¶¶ 71-72). Moreover, he concocted an elaborate backstory involving his fictitious business, which was purportedly "a sole-proprietorship consultancy specializing in infrastructure and projects based out of the Caribbean; his expenses were for 'client contract or sales and marketing;' and Beard operated the business with credit cards in his name." (PSR ¶ 71). He told the auditor he had an "offshore infrastructure of finance business" (which would be difficult for the auditor to investigate) and produced a large amount of documents that included 22 airline ticket receipts and a computer generated ledger for each flight, with additional expenses described as lodging and meals designated as "Dinner with Consultants." (PSR ¶ 72). To further embellish this façade and wrap himself in a

---

[15] Notably, the tax audit began in July 2015. (PSR ¶ 71). After that date, Beard would go on to file *three more* fraudulent tax returns for years 2015, 2016, and 2017.

cloak of trust and legitimacy using his position as CFO of the COA, he faxed a letter to the IRS *from City Hall* that described how his consulting business was a real, operating entity. (PSR ¶ 71).

This whole backstory and deluge of documents were fraudulent; the consulting business was entirely fictitious. (PSR ¶ 73). It did not operate at all and the travel and expense-related credit card transactions he claimed as business expenses were purely personal that he wrongly charged to the City. (PSR ¶ 73). There was no real "offshore infrastructure of finance business."

Beard's tax evasion and concealment involved "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or [purported] offshore financial accounts." U.S.S.G. § 2T1.1 cmt. n.5. And he did this for five separate tax filing years, including for three years after being audited. (*See* PSR ¶¶ 69, 71). The Guidelines state that this type of conduct "ordinarily indicates sophisticated means," *id.*, and this case is no exception. Beard's multifaceted, layered, and detailed concealment effort was far more sophisticated than those that have triggered the sophisticated means adjustment in other cases. *See, e.g., United States v. Maggert*, 428 F. App'x 874, 880 (11th Cir. 2011); *United States v. Barakat*, 130 F.3d 1448, 1456 (11th Cir. 1997); *United States v. Campbell*, 491 F.3d 1306, 1315–16 (11th Cir. 2007). The adjustment should be applied.

### 5. Obstruction of Justice

As reflected in paragraph 102 of the PSR, Beard should receive a two-level increase pursuant to U.S.S.G. § 3C1.1 for obstruction of justice because "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or

sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

As explained above, when audited in July 2015, Beard orchestrated a layered and multifaceted campaign to conceal the truth and impede, confuse, and obstruct IRS agents. His actions satisfy two separate categories of covered conduct in the non-exhaustive list in Note 4 of the Commentary.

First, Beard's conduct included "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1 cmt. n.4(C). While he was being audited, Beard produced to IRS agents false receipts and statements from his COA credit card that he had altered by redacting the COA billing address and the credit card number. (PSR ¶ 72; *see also* Exhibit C (comparing COA's business record with the redacted version Beard submitted to the IRS). He made these redactions to obscure that the statements were for a COA credit card, and those alterations enabled him to falsely represent that the documents were for his own credit card and that he had personally paid for the transactions. (*Id.*).

Second, Beard's conduct included "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n.4(G). During the audit, Beard provided several materially false statements to IRS agents in writing and over the phone about the existence and nature of his consulting business. Specifically, in September 2015, December 2015, and April 2016, he submitted letters, receipts, and expense reports to justify the alleged expenses.

(Doc. 130-1 at 8-9; PSR ¶¶ 71-72). Defendant also called the IRS on or about March 28, 2016, to confirm that all the documents he submitted were for travel, meals, and entertainment related to his personal business. (Doc. 130-1 at 8-9; PSR ¶¶ 71-72). These statements were false because Beard's purported business was fictitious. (PSR ¶ 70). They were also material to the IRS agents conducting the audit because they went to the heart of whether Beard appropriately deducted the transactions as business expenses. And, the statements significantly obstructed or impeded the audit because agents relied on them, and "[b]ased on Defendant's false submissions and representations, the IRS allowed Defendant to deduct $12,000 in business travel expenses that he did not actually incur." (Doc. 130-1 at 9). Additionally, Beard's elaborate lies required significant investigation and expenditure of resources to ultimately disprove, including comprehensive review of multiple financial accounts, Secretary of State records, a third-party background investigation, and interviews of Beard's executive assistant from the COA, friends, and colleagues. (PSR ¶ 70).

Beard makes two arguments against this adjustment. (Doc. 143 at 13-14). For one, he cites *United States v. Pettus*, 90 F.4th 282 (4th Cir. 2024), but that case is inapposite. He quotes *Pettus* as saying, "An obstruction enhancement, however, is not generally available if the act of 'concealment' of the offense occurs as part of the offense itself or contemporaneous with the arrest, as opposed to post-arrest conduct." As an initial matter, that quote does not actually appear in *Pettus* and it is unclear what case it comes from. Further, Beard's argument appears to be a reference to a subset of conduct described in U.S.S.G. § 3C1.1 cmt. n.4(D). *See*

*Pettus*, 90 F.4th at 285-86. But, the United States does not argue that Note 4(D) is the provision that triggers the adjustment here.

Beard's second argument is that application of the adjustment would constitute double counting, stating:

> In fact, Application Note 7 makes clear that where a defendant is convicted of obstruction (as here), the 3C1.1 enhancement applies only "if a significant *further* obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (*e.g.*, if the defendant threatened a witness during the course of the prosecution for the obstruction offense)." USSG § 3C1.1, Application Note 7.

(Doc. 143 at 13-14). However, Beard omits a critical part of the quotation. The limitation Beard cites from Application Note 7 is not triggered whenever, as Beard contends, "a defendant is convicted of obstruction." (Doc. 143 at 13). Instead, Note 7 actually starts with the statement:

> If the defendant is convicted of an offense covered by §2J1.1 (Contempt), §2J1.2 (Obstruction of Justice), §2J1.3 (Perjury or Subornation of Perjury; Bribery of Witness), §2J1.5 (Failure to Appear by Material Witness), §2J1.6 (Failure to Appear by Defendant), §2J1.9 (Payment to Witness), §2X3.1 (Accessory After the Fact), or §2X4.1 (Misprision of Felony), this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred . . . .

U.S.S.G. § 3C1.1 cmt. n.7. While Beard was convicted in Count 8 of a type of obstruction, his offense is not covered by any of the Guidelines cited in Application Note 7; it is instead covered by § 2T1.1. (PSR ¶ 97).[16] Accordingly, Note 7's prohibition on application of this adjustment is not triggered.

---

[16] Beard agreed that "the appropriate provision under which to calculate Count 8 is 2T1.1, not 2J1.2." (PSR ¶ 97; Beard PSR Ltr. at 5).

Further, general concerns about double counting do not apply here because Beard's obstruction is not accounted for elsewhere in his Guidelines calculation. And, even if it was, the case Beard cites, *United States v. Naves*, 252 F.3d 1166, 1168 (11th Cir. 2001), supports double counting where it is not prohibited by the Guidelines: "Absent a specific direction to the contrary, we presume that the Sentencing Commission intended to apply separate guideline sections cumulatively." Especially when the Sentencing Commission already purposely and explicitly enumerated which Guidelines are incompatible with a § 3C1.1 adjustment, it would not be proper to assume another Guideline should have been listed. Here, Application Note 7 does not prohibit the § 3C1.1 adjustment when an offense is calculated under § 2T1.1, so the adjustment is proper.

## Sentencing Recommendation

The sentencing factors in 18 U.S.C. § 3553(a) counsel for a substantial term of imprisonment to reflect the length, breadth, and seriousness of the offense and relevant conduct.  The Court should order restitution to make Beard's victims whole.  And the Court should impose a fine in this case given Beard's ability to pay one and to offset the future cost imposed on the Government because of Beard.

Beard was expected to act as a steward of the City's resources, and he was paid well to do so. He instead abused the public's trust; ignored fiscal controls to prevent fraud and waste; spent taxpayer money as if it was his own; pocketed even more of that money; disguised his purchase and possession of two restricted machine guns; and lied to the IRS, repeatedly, to save money.  In sum, after becoming one of Atlanta's most powerful and influential men, and unsatisfied

with his $260,000+ salary, Beard believed and acted as though he was above the law.

The nature and circumstances of the offense were egregious and sweeping. It would be wrong to see Beard's conduct as an occasional lapse in judgment. His were crimes of opportunity, and in a duration that the guidelines do not otherwise capture. It was not enough for Beard to spend tax dollars on a hotel to use while partying at Lollapalooza; he chose to do it two years in a row. Beard did not just stick the taxpayer with the bill to hang out at the New Orleans Jazz Fest for a weekend; he decided to go back the next weekend too. Why should he spend his own money to go sightseeing in San Francisco, or in Paris, when he could simply claim the travel was work-related, quash or ignore questions from his executive assistant or others, and have the City cover the expense? Beard even kept reimbursements from third parties intended to replenish COA's coffers – because how would the City even know, and what difference was $17,000?

Beard did not just steal from the Atlanta taxpayer. He also stole – by deceptively reducing his federal tax liability – from the American taxpayer. The tax loss, in excess of $100,000, is as substantial as it was fundamentally unfair. Beard's salary came from the taxpayer. Yet when it came to his own contributing to government, he employed sophisticated means to avoid paying his fair share.

As damaging to public trust as theft of government money is, this case stands apart. It shocks the conscience that Beard abused his position to personally possess machine guns. The public rightfully should expect a consequence for Beard's use of City authority and money to possess "murderously effective" and "highly

dangerous" weapons.  (*See* Doc. 61 (Government's response to Beard's motion to dismiss firearms count) (citations omitted)).

And at every step, lies.  About how he used his COA credit card.  About what he bought machine guns for.  To the City.  To the IRS.  And on down from there. He has continued to lie and refuse to accept responsibility to this day, even after his guilty plea, to the United States, the Probation Office, and even this Court about his culpability and his finances.

Imprisonment will promote general deterrence, which is "a critical factor that must be considered and should play a role in sentencing defendants . . . . [and] is more apt, not less apt, in white collar crime cases."  *United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022).  Indeed, "the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might not themselves be unlikely to commit another offense[.]" *Id.* at 209 (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (collecting cases where non-incarceration sentences in white collar cases were found to be substantively unreasonable)).  This makes sense, the Eleventh Circuit has reasoned, because "fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity." *Kuhlman*, 771 F.3d at 1329.  Because "[w]hite collar criminals often calculate the financial gain and risk of loss of their crimes . . . an overly lenient sentence sends the message that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty."  *Howard*, 28 F.4th at 209.[17]  And in

---

[17] It would do Beard no good to argue that the Government's recent prosecutions of corruption within the City of Atlanta have already achieved general deterrence,

government fraud cases in particular, "[t]he need for deterrence . . . is great." *Oudomsine*, 57 F.4th at 1268.

So too will imprisonment deter Beard specifically, for, as shown above, he lied repeatedly to the IRS and the City – even after his brush with the IRS audit brought him to the verge of having his deceptive conduct exposed.  Beard's demonstrated disinterest in reforming his ways continues in his efforts to slow-walk the Government's financial investigation.

Finally, the sentence should include restitution and the Court should impose a fine in this case.  (*See* PSR at page 41 (noting restitution amount and guidelines' fine range of $15,000 to $150,000).  U.S.S.G. § 5E1.2(a) states that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  Factors for the Court to consider in imposing a fine include:

- The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

- Any evidence presented as to the defendant's ability to pay the fine . . . in light of his earning capacity and financial resources;

- The burden that the fine places on the defendant and his dependents relative to alternative punishments;

---

for "[p]unishing white collar criminals serves to deter others from committing white collar crimes, not merely to deter the defendant or others from committing a crime that is materially identical to the one that resulted in the defendant's sentence."  *United States v. Oudomsine*, 57 F.4th 1262, 1268 (11th Cir. 2023) (citation omitted).

- Any restitution or reparation that the defendant has made or is obligated to make; and

- The expected costs to the government of any . . . term of imprisonment and term of supervised release imposed.

U.S.S.G. § 3E1.2(d).  "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.*

Here, despite Beard's incomplete and untruthful financial disclosure, his slow walking the production of some and failure to produce other requested financial records, and the Government's investigation, it appears Beard likely has significant assets available to pay financial penalties.  Beard was earning more than $260,000 annually between 2011 and 2018. (PSR ¶ 146). Then, between 2018 and 2019 alone, Beard liquidated and moved over $520,000 in funds,[18] (PSR ¶ 148), which the Government has been unable to trace.[19] The factors above counsel in favor of imposing a fine, in addition to a sentence of imprisonment.

---

[18] Beard started liquidating and moving assets in September 2018, after learning that his criminal fraud had been discovered. *See* PSR ¶ 146; Dan Klepal, *Former Atlanta CFO repays $10K Paris hotel bill after AJC stories*, ATLANTA J. CONST., June 27, 2018, available at https://www.ajc.com/news/local-govt--politics/former-atlanta-cfo-repays-10k-paris-hotel-bill-after-ajc-stories/PseV0h29Dn4jUCPsfHjW9I/

[19] Though the Government has no visibility into what he disclosed at the time because the records are sealed, Beard possessing over $520,000 of liquid assets in 2018 and 2019 calls into question whether he was entirely truthful in the financial affidavit he executed when presenting himself as indigent in 2020 for purposes of obtaining Court-funded appointed counsel. (*See* Doc. 7; Doc. 11).

## Conclusion

The Court should overrule Beard's objections, find that Beard's custody guidelines range is 33 to 41 months' imprisonment (before considering whether Beard should still receive credit for acceptance of responsibility), sentence Beard to a term of imprisonment within the final Guidelines range, order restitution, and impose a fine.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/GARRETT L. BRADFORD
*Assistant United States Attorney*
Georgia Bar No. 074374
Garrett.Bradford@usdoj.gov

COREY R. AMUNDSON
*Chief, Public Integrity Section*
*Department of Justice*

/s/ TREVOR C. WILMOT
*Trial Attorney, Public Integrity Section*
*Department of Justice*
Georgia Bar No. 936961
Trevor.Wilmot@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181